John DOES 1, 2, 3 and 4, Plaintiffs,

v.

The COVINGTON COUNTY SCHOOL BOARD OF EDUCATION, et al., Defendants.

Civil Action No. 94–D–440–N.

United States District Court, M.D. Alabama, Northern Division.

May 10, 1996.

---

Stanley J. Murphy, Tuscaloosa, AL, Ray O. Noojin, Jr., Hare, Wynn, Newell & Newton, Birmingham, AL, for plaintiff.

Allen G. Woodard, Laird, Woodard & Baker, Andalusia, AL, Mark S. Boardman, Kristi A. Dowdy, Boardman & Tyra, P.C., Birmingham, AL, for defendants.

### *MEMORANDUM OPINION AND ORDER*

DE MENT, District Judge.

Before the court is the defendants' motion for summary judgment filed November 21, 1994, the responses and replies thereto. In this case, the plaintiffs allege that the Covington County School Board of Education and several school officials are liable under a supervisory theory for their failure to prevent and stop a third-grade teacher from sexually abusing them. The plaintiffs contend that the defendants' inactions violated their rights secured by the United States Constitution, federal statutes and state laws.

The defendants contend that summary judgment. should be granted in their favor based upon immunity defenses. They further assert that, as a matter of law, their actions or omissions did not violate the plaintiffs' legal rights. After careful consideration of the arguments of counsel, the applicable case law and the evidentiary materials, the court finds that the defendants' motion is due to be granted in part and denied in part. .The court also will reserve ruling on several issues as discussed herein.

### JURISDICTION & VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1343 (civil rights jurisdiction) and 28 U.S.C. § 1331 (federal question jurisdiction). The court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the plaintiffs' state law claims. The parties do not contest personal jurisdiction or venue.

### STANDARD OF REVIEW

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he. plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as

to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

■■■ The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions in the file, together with affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553; *see also* Fed.R.Civ.P. 56(e).

■■■ In meeting this burden the non-moving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). That party must demonstrate that

there is a "genuine issue for trial." Fed. R.Civ.P. 56(c); *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.; see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

## FINDINGS OF FACT

Construing the evidence in the light most favorable to the plaintiffs, as the non-moving parties, the court finds the following facts controlling in this action:

The plaintiffs are male students who attend or have attended W.S. Harlan Elementary School in Lockhart, Alabama. Because the plaintiffs are minor children, they bring this action through their parents and/or step-parents as next friends.[1] In recognizing the vulnerability and tender age of each plaintiff, as well as the sensitive issues involved in this case, the court has allowed the plaintiffs to proceed without disclosure of names.[2]

The plaintiffs commenced this action against the following defendants: the Covington County School Board of Education ("Board of Education"); the five members of the Board of Education, sued individually and in their official capacities; Terry Holley, sued individually and in his official capacity as Principal of the W.S. Harlan Elementary School; and Dale Odom, sued individually and in his official capacity as Superintendent of Education for Covington County, Alabama (collectively "defendants").

Count I of the complaint asserts a violation of the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution, as enforced by 42 U.S.C. § 1983. Count II predicates liability under Title IX of the Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C. §§ 1681–1688. Count III alleges supplemen-

---

1. Also pending before the court is the defendants' motion for partial summary judgment, filed November 14, 1994. Therein, the defendants challenge the capacity of the father of John Doe 3 and the stepmother of John Doe 4 to serve as next friends. *See* Fed.R.Civ.P. 17(c). The court will address the merits of this motion in a separate opinion.

2. *See Does v. Covington County School Bd. of Educ.,* 884 F.Supp. 462 (M.D.Ala.1995) (De Ment, J.); *see also Doe v. Stegall,* 653 F.2d 180 (5th Cir.1981) (discussing factors for consideration by a court in deciding whether to permit party anonymity).

tal state law claims of sexual abuse and harassment, outrage, negligence,[3] and sexual assault. The plaintiffs, who have requested a non-jury trial, seek injunctive and monetary relief under the federal causes of action, damages under the state tort claims, and attorneys' fees and costs.

The plaintiffs contend that a male third-grade teacher sexually harassed and abused them for periods of a year or more. As pleaded in the complaint, the sexual abuse "included acts of sodomy and other forms of sexual assault," which occurred in the classroom, on school outings, in school buses and at the teacher's home. Pl.s' Compl. at ¶¶ 7–8. Michael Smith ("Mr. Smith"), the teacher in question, had criminal charges brought against him for his alleged sexual abuse.[4]

The plaintiffs further plead that the Board of Education and its members, as well as the Principal and Superintendent, had actual and/or constructive notice of the propensity of Mr. Smith to engage in inappropriate sexual behavior with male students. The plaintiffs further assert that despite this knowledge, the defendants failed to protect the plaintiffs from harm. The stepmother of John Doe 4 testified at her deposition that she personally complained to Principal Holley on several occasions about her fear that Mr. Smith may, or had already, engaged in inappropriate sexual conduct toward her stepson:

Q. What led you to be afraid of Mr. Smith's sexual—potential sexual advances?

A. A letter that I had found from Mr. Smith.

Q. What did the letter say?

A. Something about him having sat in [John Doe 4's] chair during a teachers meeting. I don't really remember all of what was in the letter.

\* \* \* \* \* \*

Q. Well, let's go through what happened the first time you thought that [John Doe 4] ... was being sexually abused. When you first had suspicions because you ... found a letter that Mr. Smith had written to [John Doe 4], who is the first person you went to talk to?

A. I talked with my mother-in-law.

Q. After that who is the next person you went to talk to?

A. I went to talk to Chief Mitchell.

Q. And who was the third person you talked to about that?

A. Mr. Holley.

\* \* \* \* \* \*

Q. Tell me what was said.

A. I stated my concerns to Mr. Holley, that I was concerned that [John Doe 4] was in danger of being sexually abused. Mr. Holley told me that I was impugning an innocent man's character. He said ... that he would tell Mr. Smith to stay away from [John Doe 4], but he felt like that I was very off-base with my suspicions.

\* \* \* \* \* \*

Q. Did you tell the chief of police and Mr. Holley that you thought [John Doe 4] was in danger, and I'm using the words "in danger"?

A. Yes.

Q. Did you think there had been any sexual abuse at that point in time?

A. I didn't know.

---

3. The plaintiffs contend that the defendants are liable for the "negligent hiring, supervision, and monitoring of a sexually predatory third-grade teacher" and for the negligent failure to investigate complaints made against the teacher. Pl.s' Compl. at ¶¶ 30, 31.

4. The court ordered the plaintiffs on December 28, 1994, to keep the court advised regarding the status of Mr. Smith's state court criminal proceedings. On January 24, 1995, the plaintiffs filed a letter brief and therein stated that "... the criminal process in Alabama will be delayed pending the completion of the Florida criminal appellate process." Since more than a year has now passed, the criminal proceedings certainly have concluded in both Alabama and Florida. *Accordingly, the plaintiffs are directed to notify the court in writing of the status of the criminal proceedings in Alabama and Florida and shall file with the court certified copies of either guilty verdicts and judgments entered thereon, not-guilty verdicts and judgments entered thereon, guilty pleas and judgments entered thereon, or dismissal of charges, whichever may be applicable.*

Q. Did you tell him that you thought he had perhaps been sexually abused already by Mr. Smith?

A. Yes.

Q. You told him that?

A. I said that I felt like ... something could have happened the afternoon that [John Doe 4] was in his room.

\* \* \* \* \* \*

Q. And what did you tell Mr. Holley when you went to see him?

A. We told him that we wanted Mr. Smith kept away, out of contact with our son.

Q. Who is "we"?

A. My husband and I.

Q. Both of y'all went?

A. Yes sir.

Q. And you both met with Mr. Holley?

A. Yes, sir.

Q. And did you say anything else about any other matters when you met with Mr. Holley other than you want Mr. Smith kept away from your son?

A. Not that I remember.

\* \* \* \* \* \*

Q. Tell me everything you or your husband told Mr. Holley in that meeting please.

A. The fact that Mr. Smith was still in contact with [John Doe 4] and that we didn't want Mr. Smith talking or being around [John Doe 4].

Q. Is that everything that you told Mr. Holley ...?

A. Yes.

Q. So you told him that Mr. Smith was talking to [John Doe 4]?

A. That he was still in contact with him, yes.

Q. ... Are those the words you used, "still in contact"?

A. I don't remember my exact words. He was still seeing [John Doe 4] and talk-

ing to [John Doe 4] at break time and on the playground.

\* \* \* \* \* \*

A. I went to talk to [Mr. Holley] about the fact that Mr. Smith was still talking and having conversations with [John Doe 4], and he called me—he told me I was boldface lying, that he knew that Mr. Smith was not talking to [John Doe 4].

\* \* \* \* \* \*

Q. Can you remember anything you said in either of those meetings, either the first meeting you had with Mr. Holley or either this, the third meeting with Mr. Holley?

A. When he said that I was lying, I told him that I was not, and I handed him the birthday card and showed him the candy and the dollar bill that Mr. Smith had given [John Doe 4] for his birthday.

\* \* \* \* \* \*

Q. Now, the few days before school went out for Christmas, what did you tell Mr. Holley?

A. I went to the school. My mother-in-law drove me to the school, and I had a red computer Christmas card that Mr. Smith gave [John Doe 4], and I begged him to please keep Mr. Smith away from [John Doe 4].[5]

Q. How did you beg him ...?

A. I just asked him to please keep Mr. Smith away from [John Doe 4].

Dep. of Stepmother of John Doe 4 at 87, 133, 134–35, 164, 166–67, 178, 179, 207, 218–19.

In his affidavit, Chief Lamar Mitchell ("Chief Mitchell") of the Florala Police Department, avers that he personally witnessed one of the meetings between the stepmother and Principal Holley. Chief Mitchell's affidavit corroborates the stepmother's account of the meeting. Specifically, Chief Mitchell states as follows:

5. During this meeting, the stepmother of John Doe 4 told Mr. Holley that she was very concerned about the inappropriate behavior of one of the third grade teachers at the school directed toward her stepson.

---

**5.** In his affidavit, Principal Holley states that "it was common practice for teachers to give students birthday and/or Christmas cards." Hol-
ley's Aff. at ¶ 2; *see* Def.s' Resp. to Pl.s' Opp. to Summ.J., filed Dec. 30, 1994 (Ex. A attached thereto).

6. The stepmother told Mr. Holley that she feared that the teacher (Michael Smith), would subject her stepson to sexual abuse. She said that her stepson had been the victim of sexual abuse once before and that she was very concerned that this not be allowed to happen again.

7. The stepmother told Mr. Holley that her fears were based on at least two incidents. The first incident occurred a week or two before when the stepson was missing for a period of time after parent-teacher conferences. After a search of the school, and after an announcement on the school intercom, the child was discovered coming out of Smith's classroom, holding Smith's hand. The second thing which concerned her was her discovery of a note from Smith to her stepson. The note told John Doe 4 that he (Smith) had "sat in his (the student's) desk during a teacher's meeting," or words to that effect.

8. Mr. Holley's reactions were very defensive and almost hostile to the stepmother's concerns. He told her that she was impugning the character of one of his best teachers.

\* \* \* \* \* \*

10. In response to the stepmother's request, Mr. Holley said that he would take care of keeping Smith away from John Doe 4.

Aff. of Mitchell, dated Nov. 28, 1994; *see* Pl.s' Opp. to Summ.J., filed Dec. 8, 1994 (Ex. F attached thereto).

Dr. Robert Dennis Lyman ("Dr. Lyman"), Ph.D., the plaintiff's expert in prevention and treatment of child sexual abuse, submitted an affidavit. Therein he states that "the complaints and concerns voiced by the stepmother and father of John Doe 4 about the possibility of sexually inappropriate behavior of the teacher in question to their son should have been adequate notice to cause school authorities to make a substantive inquiry into those complaints." Aff. of Dr. Lyman at ¶ 8; *see* Pl.s' Opp. to Mot. Summ.J., filed Dec. 8, 1994 (Ex. I attached thereto). Dr. Lyman earned his Ph.D. in clinical psychology in 1975 from the University of Alabama. He currently is employed by the University of Alabama as Professor of Psychology. *Id.* at ¶ 2 & Curriculum Vitae (attached thereto).

In addition, the plaintiffs have submitted evidence indicating that Christopher A. Hutcheson ("Mr. Hutcheson"), who presently serves as a member of the Board of Trustees of W.S. Harlan Elementary School, met with Principal Holley regarding Mr. Smith's suspected "inappropriate behavior toward young boys." Aff. of Mr. Hutcheson at ¶ 6; *see* Pl.s' Mem. in Opp. to Summ.J. (Ex. H attached thereto). This meeting occurred "near the end of August or early September, 1992." *Id.* at ¶ 5.

Mr. Hutcheson states that his concern arose from his personal observation of Mr. Smith's interaction with John Doe 1 and other male elementary students. Mr. Hutcheson also avers that, based upon the following observations, he believed Mr. Smith exhibited "characteristics" of homosexuality:

a. Both in school and out of school, Smith appeared constantly to be in the company of young boys;

b. Smith rarely socializes with adults; at school functions and other occasions when both children and adults were present, Smith almost always chose to play with the children, particularly the young boys;

c. During his play with young boys, Smith had a great deal of physical contact with them, often having young boys literally "hanging off of him";

d. As in the case of John Doe 1, Smith insisted that young boys sit in his lap; and

e. Smith's overall demeanor and mannerisms were not normal.

*Id.* at ¶ 8.

According to Mr. Hutcheson, Principal Holley "defended Mr. Smith's actions" and stated that the reason Mr. Smith was "overly attached to young boys" probably was due to "a tragic accident involving Mr. Smith's nephew." *Id.* at ¶ 9. Principal Holley told Mr. Hutcheson, however, that he would "look into the matter." *Id.* A few weeks later, Principal Holley told Mr. Hutcheson that he saw a male student sitting in Mr. Smith's lap and counseled Mr. Smith "not to do that any more." *Id.* at ¶ 10. According to Mr. Hutcheson, however, Principal Holley made

no further report to him of any investigation or follow-up to their meeting. *Id.* at ¶ 11.

Mr. Hutcheson subsequently submitted a second affidavit. Therein, Mr. Hutcheson emphasizes that when he spoke with Principal Holley, he did not have any "evidence" that Mr. Smith actually was molesting his students, rather Mr. Smith's "appearance of impropriety" led to his conversation with Principal Holley. Aff. of Mr. Hutcheson, dated Dec. 30, 1994, at ¶ 3; *see* Def.s' Mem. in Resp. to Pl.s' Opp. to Def.s' Mot. Summ.J., filed Dec. 30, 1994 (Ex. B attached thereto). He further states that, "a short time after their conversation," Principal Holley approached Mr. Smith and "discussed the appearance that Mr. Smith's behavior may create." *Id.* at ¶ 4.

Principal Holley states that he "had no knowledge or notice of the alleged sexual abuse of students[,] which is claimed to have occurred both on and off of school property." Aff. of Holley at ¶ 2; *see* Def.s' Resp. to Pl.s' Opp. to Summ.J., filed Dec. 30, 1994 (Ex. A attached thereto). In sum, Principal Holley contends that, at most, he had knowledge of strange behavior and homosexuality tendencies on the part of Mr. Smith, which does not amount to allegations of actual sexual abuse.

The plaintiffs also assert that the defendants failed to investigate complaints made against Mr. Smith and further failed to provide counseling for those students who had been abused. In addition, the plaintiffs allege that *after public disclosure of the alleged incidents of sexual abuse*, none of the defendants took action to determine if there were other victims of abuse among the current and former students of the elementary school. However, Principal Holley, in his affidavit, states that the "first notice of allegations by the plaintiffs of inadequate post-abuse counseling was [his] receipt of this lawsuit." *Id.* at ¶ 2.

The plaintiffs further claim that the Board of Education did not have in effect, at least at the W.S. Harlan Elementary School, any of Title IX's required procedures for the receipt, investigation and recording of complaints about potential sexual abuse of students by their teachers. Regarding grievance procedures, Principal Holley testified as follows:

Q. [W]as there a grievance policy in effect?

A. Yes, sir.

Q. And was it written down?

A. Yes, sir.

Q. And where was it kept or how was it publicized?

A. Board policy and also usually on bulletin boards.

Q. And what was the function of the grievance policy?

A. For any complaints in any form or fashion to be brought before the Board of Education.

Q. Was it published in any document which was distributed?

A. Yes.

Q. Which document is that?

A. The Board policy.

Q. And to whom is the Board policy distributed?

A. All personnel.

Q. All employees?

A. Yes, sir.

Q. Just like a personnel manual?

A. Everyone would receive one, to my knowledge.

Q. Everyone? You mean all employees?

A. Yes, sir.

Q. Did anybody other than employees receive it?

A. It was there upon request.

Dep. of Holley at 67–69; *see* Pl.s' Opp. to Mot.Summ.J. (Ex. C attached thereto). Principal Holley further reiterates in his affidavit that

[t]he Covington County Board of Education maintains a policy against sexual harassment that is posted on bulletin boards where parents, students, and employees have access. This policy was also distributed to employees in the board policy manual and was (and is) available to anyone upon request. At W.S. Harlan School, we maintained an open door policy regarding grievances. I announced our policy regarding grievances at PTO meet-

ings, Chapter I meetings and in individual meetings with parents and students. Holley's Aff. at ¶ 3; *see* Def.s' Mem. in Resp. to Pl.s' Opp. to Def.s' Mot.Summ.J. (Ex. A attached thereto).

On the other hand, Dr. Lyman contends that, at the time the sexual molestation occurred, the defendants did not have "an adequate policy or procedure in effect for educating children or school personnel on the prevention and detection of child abuse." Aff. of Dr. Lyman at ¶ 7. He further states that "there was no adequate procedure in place for parents or students to make complaints about fears of child abuse, and to have those complaints appropriately investigated." *Id.*

Finally, the plaintiffs claim severe psychological injury caused by the defendants. Specifically, Dr. Lyman states that, in his opinion, "the failure of the school authorities to respond with appropriate educational and therapeutic intervention to the plaintiffs and to the school community generally in the immediate aftermath of the arrest of the school teacher contributed to the psychological injuries of the Plaintiffs...." *Id.* He further states that, based upon his interviews with the plaintiffs, "each ... suffered psychological injury as a result of the abuse itself, and of the failure of the school authorities to respond appropriately." *Id.* at ¶ 10.

## DISCUSSION

### I. TITLE IX OF THE EDUCATION AMENDMENTS OF 1972

Title IX of the Education Amendments of 1972, §§ 901–909, as amended, 20 U.S.C. §§ 1681–1688 ("Title IX"), prohibits sex discrimination by educational institutions receiving federal financial assistance.[6] The court previously has found that the school system receives federal financial assistance within the meaning of Title IX and, thus, is subject to its provisions.[7]

The plaintiffs request both monetary and injunctive relief for the Board of Education's alleged violations of Title IX. Until recently, a plaintiff's sole remedy was the denial of financial aid to the education institution. *Davis v. Monroe County Bd. of Educ.*, 74 F.3d 1186, 1190 (11th Cir.1996). In 1992, however, the Supreme Court of the United States, held that a school system, receiving federal financial assistance, can be liable for monetary damages to a victim of intentional discrimination. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 64–76, 112 S.Ct. 1028, 1031–38, 117 L.Ed.2d 208 (1992). Hence, if the plaintiffs show that the Board of Education failed to take adequate remedial measures in response to complaints that Mr. Smith was sexually harassing students and that such failure resulted from intentional discrimination based on sex, then an award of monetary damages will be appropriate.

The plaintiffs allege two factually distinct but legally related violations under Title IX. First, the plaintiffs contend that, prior to and during the alleged sexual abuse by Mr. Smith, the Board of Education failed to comply with the requirements of Title IX. Specifically, the plaintiffs state, that during this time, neither the school system as a whole, nor W.S. Harlan Elementary School in particular, had an acceptable sexual abuse/discrimination education program or a complaint investigation policy. Second, the plaintiffs allege that the Board of Education failed to act in an appropriate manner once

6. Title IX provides, in part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance...." 20 U.S.C. § 1681(a).

7. *See Does v. Covington County School Bd. of Educ.*, 884 F.Supp. 462 (M.D.Ala.1995) (De Ment, J.). Hereafter, the court will refer to its March 10, 1995 order as *"Covington 1."* In *Covington 1*, the defendants argued that to state a claim under Title IX, the plaintiffs must show that the sex discrimination occurred within a specific program receiving federal financial assistance. Based upon the Civil Rights Restoration Act of 1987, codified at 20 U.S.C. § 1687 (1988), wherein Congress rejected this "program-specific" requirement, the court denied the defendants' motion to dismiss the Title IX claim. Under current law, an educational institution receiving federal financial assistance faces Title IX sanctions if any program in the institution discriminates on the basis of sex, whether or not the offending program receives federal assistance.

the sexual abuse by Mr. Smith had been discovered. The plaintiffs assert that this failure to act subjected the plaintiffs to sex discrimination in violation of Title IX. Before examining the merits of these two substantive claims, the court will address the defendants' defenses that individual-capacity lawsuits are barred under Title IX and that the plaintiffs' failure to exhaust administrative remedies precludes a federal lawsuit.

### A. Individual–Capacity Lawsuits

■ The defendants argue that the Title IX claim should be dismissed against the individual defendants on the basis that there is no cause of action against individuals under Title IX. While the complaint appears to allege a Title IX claim only against the Board of Education, some ambiguity exists about whether the individual defendants of the Board of Education, the Principal and Superintendent also are sued under Title IX. Because the plaintiffs have not opposed the defendants' argument, it appears that they are suing only the Board of Education for alleged violations of Title IX. Nonetheless and in an abundance of caution, the court will presume that the plaintiffs' Title IX claim is against all defendants.

The court agrees with the defendants that Title IX actions may only be brought against an educational institution or entity, not an individual acting as an administrator or employee of the institution or entity. *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 901 (1st Cir.1988); *Doe v. Petaluma City School Dist.*, 830 F.Supp. 1560 (N.D.Calif.1993); *Dickinson v. McCarty*, Civ.A. No. 93–8210, 1994 WL 706979 (S.D.Fla.1994). The court is particularly persuaded by the thoughtful reasoning in *Petaluma City School District:*

> Courts that have addressed the question [of individual liability under Title IX] have held that only institutions may be liable under Title IX, not individuals. *See, e.g., Lipsett*, 864 F.2d at 901. The court agrees that individuals may not be held personally liable under Title IX. Since the Act prohibits discrimination against beneficiaries in programs and activities that receive federal financial assistance, it is the edu-

cational institution that must be sued for violations of Title IX.

\* \* \* \* \* \*

While a private right of action for damages exists under Title IX, the fact that administrative enforcement is directed at the institution that received federal funds suggests that the private right of action is similarly confined to actions against the institution.

830 F.Supp. at 1576–77 (internal citations omitted).

The court added that the 1986 amendment to Title IX, 42 U.S.C. § 2000d–7, which abrogated Eleventh Amendment immunity for violations of Title IX, is consistent with the conclusion "that there is no private right of action against individuals, since only remedies against 'public or private entities' are mentioned." *Id.* at 1577. After examining the prohibition against individual liability lawsuits under Title VII of the Civil Rights Act (42 U.S.C. §§ 2000e–2000e–17) and the Age Discrimination in Employment Act (29 U.S.C. §§ 621–634), the court likewise found that neither the plain language of Title IX nor its legislative history compels holding individuals liable under Title IX. *Id.* Hence, the court stated that "it would make little sense to interpret Title IX to permit individual liability absent clear direction from Congress. That clear direction is lacking." *Id.*

Based upon this authority, the court finds that the individual defendants may not be held personally liable under Title IX. Accordingly, the defendants' motion for summary judgment is due to be granted regarding the plaintiffs' Title IX cause of action, if any, against the individual members of the Board of Education, the Principal and Superintendent.

### B. Exhaustion of Administrative Remedies

■ The defendants argue that the plaintiffs' failure to exhaust administrative remedies mandates an entry of summary judgment in their favor. Specifically, the defendants contend that the plaintiffs did not complain to the Board of Education about its policies and alleged inaction, or any

alleged injuries to the plaintiffs, prior to filing this lawsuit. The defendants contend that the plaintiffs were first required to notify the Board of Education of their complaints and then appeal any decisions through the appropriate state agencies. The defendants have cited no authority in support thereof, and the court, after conducting independent research, finds that the law is directly contrary to the defendants' assertion.

In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court of the United States noted that Title IX does not require a plaintiff to exhaust administrative remedies before pursuing a private cause of action in federal court. *Id.* at 707 n. 41, 99 S.Ct. at 1963 n. 41. According to the Supreme Court, Title IX administrative remedies do not provide adequate relief for private persons. *Id.* at 706–08 n. 41, 99 S.Ct. at 1963 n. 41. Accordingly, the court finds that the defendants' argument lacks any merit and that summary judgment cannot be granted on this basis.

### C. Title IX's Prohibition against Sex Discrimination

The defendants first argue that the plaintiffs' Title IX claim is not actionable because "this case deals with the alleged sexual abuse of children, not sex-based discrimination which is prohibited by Title IX." Def.s' Mem. in Resp. to Pl.s' Opp. to Summ. J., filed Dec. 30, 1994, at 10. The court rejects this argument. While the only issue in *Franklin, supra,* was whether Title IX authorizes an award of compensatory damages, the Supreme Court impliedly accepted that sexual abuse of a student by a teacher constitutes sex discrimination under Title IX:

> Unquestionably, Title IX placed on the Gwinnett County Schools the duty not to discriminate on the basis of sex, and "when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." We believe the same rule should apply when a teacher sexually harasses and abuses a student.

503 U.S. at 75, 112 S.Ct. at 1037. (internal citation omitted).[8]

Recently, the Court of Appeals for the Eleventh Circuit confirmed that such a claim is actionable: "Title IX encompasses a claim for damages due to a sexually hostile educational environment created by a fellow student or students when the supervising authorities knowingly failed to act to eliminate the harassment."[9] *Davis*, 74 F.3d at 1193 (citing *Franklin*, 503 U.S. at 74–75, 112 S.Ct. at 1037–38). While *Davis* involved sexual abuse by a student, the Eleventh Circuit's reasoning applies equally, or with even greater force, when the harasser is a teacher. That is, the connection between a student and Title IX's prohibitions is far more tenuous than that of a teacher, who is an *agent* of the Board of Education, the latter of "which

**8.** In *Franklin*, a high-school student alleged that supervisory school officials failed to intervene when they learned that the student's teacher had sexually harassed and assaulted her. *Id.* at 63–64, 112 S.Ct. at 1031–32.

**9.** Prior to *Davis*, there was no controlling law in the Eleventh Circuit regarding the legal standard for evaluating such a claim, and other circuits were not in agreement. The various standards adopted by courts are succinctly set forth in *Bolon v. Rolla Public Schools*, 917 F.Supp. 1423 (D.Mo.1996), from which the court quotes:

> (1) the agency principles contained in the Restatement (Second) of Agency § 219(2)(b) (essentially a "negligent or reckless" standard), see *Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.*, 900 F.Supp. 844 (W.D.Tex. 1995); *Rosa H. v. San Elizario Indep. Sch. Dist.*, 887 F.Supp. 140 (W.D.Tex.1995); (2) knowledge or direct involvement by the school district, see *Howard v. Board of Educ.*, 876

F.Supp. 959 (N.D.Ill.1995) (involving sexual harassment of an employee rather than a student); *Letlow v. Evans*, 857 F.Supp. 676 (W.D.Mo.1994); *Floyd v. Waiters*, 831 F.Supp. 867 (M.D.Ga.1993); *R.L.R. v. Prague Pub. Sch. Dist. I–103*, 838 F.Supp. 1526 (W.D.Okla. 1993); (3) the Title VII standards of employer liability in sexual harassment cases (i.e., "knew or should have known" for hostile environment and strict liability for quid pro quo harassment), see *Murray v. New York Univ. College of Dentistry*, 57 F.3d 243 (2d Cir.1995); *Kadiki v. Virginia Commonwealth Univ.*, 892 F.Supp. 746 (E.D.Va.1995); *Hastings v. Hancock*, 842 F.Supp. 1315 (D.Kan.1993); *Patricia H. v. Berkeley Unified Sch. Dist.*, 830 F.Supp. 1288 (N.D.Cal.1993); and (4) strict liability, see *Leija v. Canutillo Indep. Sch. Dist.*, 887 F.Supp. 947 (W.D.Tex.1995).
> *Id.* at 1427.

is clearly an 'educational program or activity'" under Title IX. *Davis,* 74 F.3d at 1196 (concurring in part and dissenting in part). Hence, it is clear that sexual abuse by a teacher, as alleged by the plaintiffs, is a form of sex discrimination under Title IX.

■ Neither party has addressed the appropriate legal standard for determining the Board of Education's liability, if any, for the teacher's alleged sexual abuse of the plaintiffs. In *Davis,* the Eleventh Circuit held that the general principles of Title VII apply "to a sexually hostile education environment created by a fellow student or students when the supervising authorities knowingly fail to act to eliminate the harassment."[10] 74 F.3d at 1192 & 1193. The Eleventh Circuit reached its decision after an extensive analysis of *Franklin* and Title IX's legislative history, as well as case law from other circuits, and concluded that these authorities "supported" its holding. *Id.* at 1193. While the plaintiffs have not used the legal phrase "sexually hostile education environment" to describe their claim, the court finds that the plaintiffs' continuous references in their complaint and briefs to "sexual abuse and harassment" have provided the defendants ample notice of their intent to seek redress under such a theory.

■ Accordingly, the court will analyze the plaintiffs' claim under the test forth in *Davis.* To survive the Board of Education's motion for summary judgment, each plaintiff must establish:

(1) that [he] is a member of a protected group; (2) that [he] was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] education and create an abusive educational environment; and (5) that some basis

for institutional liability has been established.

*Id.* at 1194 (citations omitted).

■ Whether the plaintiffs are members of a protected group requires the court to determine if Title IX provides protection for same-sex discrimination. Unlike *Franklin* and *Davis,* the plaintiffs and the alleged harasser in this case are all males. While the Eleventh Circuit has not been confronted with this issue, the district court in *Prescott v. Independent Life & Accident Ins. Co.,* 878 F.Supp. 1545 (M.D.Ala.1995) (Thompson, J.), found that Title VII protects against same-gender sexual harassment based upon a quid pro quo theory of liability:

In the instant case, plaintiff has alleged quid pro quo sexual harassment. As stated above, under that form of harassment, the plaintiff claims that a supervisor required sexual favors for advancement, or for continued employment. The court believes that the gender of the person who requests such favors is not relevant. Under quid pro quo sexual harassment, all that is required is a supervisor who conditions the terms of employment on the employee's giving in to the supervisor's sexual demands. In fact, homosexual quid pro quo sexual harassment has been recognized for some time. *See, Joyner v. AAA Cooper Trans.,* 597 F.Supp. 537, 542 (M.D.Ala.1983), *affirmed without opinion,* 749 F.2d 732 (11th Cir.1984); *Wright v. Methodist Youth Services, Inc.,* 511 F.Supp. 307, 310 (N.D.Ill.1981).

*Id.* at 1549–50.

The court concurs with the reasoning in *Prescott,* as the object of the law is still the same regardless of the sex of the one harassing and the one being harassed. Moreover, while liability in *Prescott* was not premised upon a hostile work environment theory, as here, the court finds this difference immaterial.[11] Both theories of liability attack a

---

**10.** In *Davis,* the district court granted the school board's motion to dismiss the plaintiffs' Title IX cause of action on the following ground:

"[t]he sexually harassing behavior of a fellow fifth grader is not part of a school program or activity. Plaintiff does not allege that the Board or an employee of the Board had any role in the harassment. Thus, any harm to

[plaintiff] was not proximately caused by a federally-funded educational provider."
74 F.3d at 1188 (quoting *Aurelia D. v. Monroe County Bd. of Educ.,* 862 F.Supp. 363, 367 (M.D.Ga.1994)). The Eleventh Circuit reversed.

**11.** There are two distinct types of sexual harassment: quid pro quo and hostile work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477

manifestation of the same evil the law is designed to prevent. Additionally, the purpose of the federal statute at issue here (Title IX) is to eradicate sex discrimination in educational institutions receiving federal financial assistance, and, as case law reveals, there is more than one legal means to achieving this end. Accordingly, the court finds that the plaintiffs have met the first element of their cause of action.

■■■ In proving the second element, that the harassment was unwelcome, each plaintiff must show that he "did not solicit nor incite it, and . . . that [he] regarded the conduct as undesirable or offensive." *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir.1982) (citations omitted). Under the third element, each plaintiff must demonstrate that "but for the fact of [his] sex, [he] would not have been the object of harassment." *Id.* at 904 (citations omitted). The fourth element requires a showing that the harassment in its totality is "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993). The pervasiveness of the conduct turns "not only on the frequency of the incidents, but the gravity of the incidents as well." *Vance v. Southern Bell Tel. and Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). In other words, "a hostile environment in an educational setting is not created by simple childish behavior or by an offensive utterance, comment, or vulgarity." *Davis*, 74 F.3d at 1194.

■■■ While the plaintiffs have alleged in their complaint continuous acts of sexual abuse by Mr. Smith, they have submitted little evidence in support of these allegations. Hence, the court cannot analyze the second, third and fourth elements. The specific incidents cited by the plaintiffs are limited to: (1) Mr. Hutcheson's statement that Mr. Smith insisted that John Doe 1 sit on his lap;

(2) evidence that after a parent-teacher conference, John Doe 4 was missing for a short period of time and was later discovered coming out of Mr. Smith's classroom, holding Mr. Smith's hand; (3) testimony about a note (which is not in the record) to John Doe 4, wherein Mr. Smith wrote that he had sat in John Doe 4's classroom desk during a teacher's meeting; (4) testimony that Mr. Smith gave John Doe 4 a card (which also has not been submitted as evidence), candy and a one dollar bill for his birthday. In fact, the defendants submitted the most offensive, incident of sexual misconduct. This evidence is the testimony of a parent of one of the plaintiffs that when she asked her son in October 1993 if Mr. Smith had "ever touched [him], he said 'yes.'" Moreover, the record is devoid of any evidence regarding Mr. Smith's alleged sexual abuse of John Doe 2 and John Doe 3.

On a motion for summary judgment, the plaintiffs must support the complaint's allegations by references to admissible evidence, such as references to affidavits, interrogatory answers and depositions. *See* Fed.R.Civ.P. 56(e). The plaintiffs' submission is inadequate to overcome summary judgment as they have failed to point to specific dates and incidents supporting their underlying claims of sexual abuse. The plaintiffs' evidence and briefs focus primarily on the notice requirement, which is only one element of the cause of action. For example, without evidence of any sexual abuse, the court has no way of evaluating whether, under the fourth element, the alleged sexual abuse is sufficiently severe and patterned.

Because the legal standard for evaluating a claim for a sexually abusive education environment was not clearly defined in this circuit until a few months ago, the court, in the interest of justice, will allow the plaintiffs to supplement their evidence in opposition to summary judgment. The court is, of course, not required to do so and is, in effect, allowing the plaintiffs "two bites at the apple."

U.S. 57, 65–66, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). Because the plaintiffs in this action have not alleged any facts that the teacher, either explicitly or implicitly, conditioned their "academic achievement" on providing sexual favors or submitting to sexual advances, the

quid pro quo theory is not applicable in this case. *Alexander v. Yale Univ.*, 459 F.Supp. 1, 4 (D.Conn.1977), *aff'd*, 631 F.2d 178 (1980) (Title IX); *see also Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989) (Title VII).

Accordingly, the court directs the plaintiffs to submit to the court a detailed outline of the acts of alleged sexual abuse as to each plaintiff and the dates on which each occurred. The outline must be organized as follows:

I. *Alleged Acts of Sexual Abuse by Mr. Smith*

 **A. John Doe 1**

 1. Date: Specific incident # 1

 2. Date: Specific incident # 2

 **B. John Doe 2 . . .**

 **C. John Doe 3 . . .**

 **D. John Doe 4 . . .**

Additionally, each incident of alleged sexual abuse shall include a specific reference to the evidence, such as citations of page numbers of depositions, and all materials that the plaintiffs wish the court to consider must be attached to the outline. *See* Ct.'s Rule 16 Scheduling Order, entered June 20, 1994, at ¶ 1. The plaintiffs are further directed to submit as evidence the Birthday and Christmas cards, referred to above, which were given to John Doe 4 by Mr. Smith.

The court also at this time is not completely convinced that the evidence of notice submitted by the plaintiffs is sufficient, as a matter of law, to create a jury issue as to the fifth element of the plaintiffs' cause of action. That is, the complaints and concerns expressed by the stepmother of John Doe 4 to Principal Holley is not evidence of sexual abuse but, rather, at the most constitutes a potential for abuse by Mr. Smith. The information received by Principal Holley amounts to complaints about perceived homosexual tendencies on the part of Mr. Smith, children sitting on his lap, and Mr. Smith's gifts of candy, cards and a dollar bill. While Mr. Smith's acts are suspect and peculiar, they are not necessarily sexual in nature and could be perceived as benign. To the contrary, in the cases reviewed by the court, the complaints reported by the plaintiffs of sexual abuse and harassment were in the form of specific examples. *See e.g., Davis,* 74 F.3d at 1188–89 (both the plaintiff's teacher and principal had knowledge of particular incidents directed toward the plaintiff by a peer; these incidents included offensive language (i.e.,

" 'I want to get in bed with you' "), fondling and sexual suggestive behavior by the peer); *Petaluma City School Dist.,* 830 F.Supp. at 1564 (plaintiff and her parents reported to a school counselor that the plaintiff's peers made offensive remarks to her—such as " 'I hear you have a hot dog in your pants' "—and spread sexual rumors and innuendoes about the plaintiff). Hence, the plaintiffs are further directed to provide authority supporting their assertion that complaints to a principal of a teacher's *potential* for sexual misconduct with students, absent concrete sexual examples directly implicating a teacher, satisfies the notice requirement.

Moreover, the plaintiffs have not provided any examples of notice given to either the Superintendent or individual members of the Board of Education. Rather, the plaintiffs' claim against these defendants appears to be based upon a theory of constructive knowledge. The plaintiffs, however, have not shown the court any authority supporting this theory of liability. Accordingly, the plaintiffs also are directed to submit a brief on the applicable law regarding constructive notice and are further directed to apply the law to the facts of this case. The court's research indicates that, if sufficiently pervasive, the alleged acts of sexual abuse may constitute an alternative method of demonstrating notice on the part of school supervisory officials. *See Henson,* 682 F.2d at 905 (holding that the "[t]he pervasiveness of the harassment" can "give[ ] rise to the inference of knowledge or constructive knowledge"). The plaintiffs' brief also should include an analysis of *Henson* as it applies to this case. Accordingly, the court will reserve ruling on the defendants' motion for summary judgment as to this part of the Title IX claim until the plaintiffs have responded to the directives herein and the defendants have had an opportunity to respond.

 D. *Failure to Comply with Title IX's Requirements*

Title IX and its implementing regulations mandate that a school system adopt and publish grievance procedures for receiving and investigating complaints by students and employees of sex discrimination. *See* 34 C.F.R. §§ 106.8, 106.9. Additionally, Title

IX regulations require recipients to appoint a Title IX coordinator to whom students and employees may voice complaints and to inform both students and employees of the coordinator's name, address and telephone number of the coordinator.[12] *Id.* In sum, the plaintiffs assert that the Board of Education has failed to comply with the requirements listed in 34 C.F.R. §§ 106.8 & 106.9.

Before the court can rule on this alleged violation of Title IX, the court needs clarification of several pertinent facts. The defendants have submitted evidence that the Board of Education had a grievance procedure that complied with Title IX and that this grievance procedure was posted on bulletin boards. In addition to the absence in the record of a copy of this grievance procedure, the court does not know the date that the Board of Education implemented this procedure. While the court realizes that the plaintiffs bear the burden of production on

such crucial issues, the court finds that, based upon the serious nature of the plaintiffs' allegations, justice will be best served by allowing supplemental evidence.

Because the following items are more accessible to the defendants, the court directs the defendants to submit to the court the following documents:

(1) a copy of the grievance procedure posted on bulletin boards (as discussed by Principal Holley in his deposition and affidavit); and

(2) a copy of the Board Policy, in which the grievance procedure was published.

The court further directs the defendants to provide answers to the following questions in the form of admissible evidence, such as an affidavit:

(1) on what date did the defendants implement the grievance procedure and on what

12. Section 106.8 provides as follows:

(a) Designation of responsible employee. Each recipient [of federal funds] shall designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under this part, including any investigation of any complaint communicated to such recipient alleging its noncompliance with this part or alleging any actions which would be prohibited by this part. The recipient shall notify all its students and employees of the name, office address and telephone number of the employee or employees appointed pursuant to this paragraph.

(b) Complaint procedure of recipient. A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

Section 106.9, in pertinent part, states that:

(a) Notification of policy. (1) Each recipient shall implement specific and continuing steps to notify ... students and parents of elementary and secondary school students ... that it does not discriminate on the basis of sex in the educational programs or activities which it operates, and that it is required by title IX and this part not to discriminate in such a manner. Such notification shall contain such information, and be made in such manner, as the Assistant Secretary finds necessary to apprise such persons of the protections against discrimination assured them by title IX and this part, ... [and] shall state ... that inquiries concerning the application of title IX and this part to such recipient may be referred to

the employee designated pursuant to § 106.8, or to the Assistant Secretary.

(2) Each recipient shall make the initial notification required by paragraph (a)(1) of this section within 90 days of the effective date of this part or of the date this part first applies to such recipient, whichever comes later, which notification shall include publication in: (i) Local newspapers; (ii) newspapers and magazines operated by such recipient or by student, alumnae, or alumni groups for or in connection with such recipient; and (iii) memoranda or other written communications distributed to every student and employee of such recipient.

(b) Publications. (1) Each recipient shall prominently include a statement of the policy described in paragraph (a) of this section in each announcement, bulletin, catalog, or application form which it makes available to any person of a type, described in paragraph (a) of this section, or which is otherwise used in connection with the recruitment of students or employees. (2) A recipient shall not use or distribute a publication of the type described in this paragraph which suggests, by text or illustration, that such recipient treats applicants, students, or employees differently on the basis of sex except as such treatment is permitted by this part.

(c) Distribution. Each recipient shall distribute without discrimination on the basis of sex each publication described in paragraph (b) of this section, and shall apprise each of its admission and employment recruitment representatives of the policy of nondiscrimination described in paragraph (a) of this section, and require such representatives to adhere to such policy.

date was the grievance procedure posted on each bulletin board?;

(2) on how many bulletin boards was the grievance procedure posted in W.S. Harlan Elementary School and, also, in the school system as a whole?;

(3) where were the bulletin boards located in W.S. Harlan Elementary School and in the school system as a whole?;

(4) from 1990 to 1994, list the number of PTO meetings and Chapter 1 meetings held, and, at which meetings Principal Holley discussed the school system's grievance procedure and provided the requisite information about the Title IX coordinator;

(5) from 1990 to 1994, was it the practice of Principal Holley to hold individual meetings with each student and his or her parents about the grievance policy. If not, explain in detail what Principal Holley meant when he stated that he communicated the school system's grievance procedure in individual meetings with parents and students; and

(6) from 1990 to 1994, list all Title IX coordinators appointed pursuant to 34 C.F.R. § 106.8, and if and how their names, addresses and telephone numbers were disseminated to the parents of the schoolchildren attending W.S. Harlan Elementary School.

Again, the court will reserve ruling on the defendants' motion for summary judgment based upon their assertion that the Board of Educations has fully complied with Title IX's requirements of the adoption and publication of grievance procedures.

## II. 42 U.S.C. § 1983

Section 1983 creates a mechanism for recovering monetary damages and injunctive relief from governmental actors and entities whose actions under color of state or local law deprive a plaintiff of rights, privileges or immunities secured by the United States Constitution or federal statutes. Thus, § 1983 " 'is not itself a source of substantive rights,' but merely provides 'a meth-

od for vindicating federal rights elsewhere conferred.' " *Albright v. Oliver*, 510 U.S. 266, ——, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994) (citations omitted). Here, the plaintiffs claim that their right to be free from sexual abuse by a public school teacher is protected under Title IX and the Fourteenth Amendment to the United States Constitution.

### A. The Title IX Claim

The plaintiffs seek to enforce their rights under Title IX both directly and derivatively though § 1983.[13] While the defendants have not objected to the plaintiffs' dual cause of action, its permissibility presents a novel question of law in this circuit regarding preemption and Title IX liability of individual defendants under § 1983 and, thus, warrants discussion.

The first issue is whether, in conjunction with their Title IX claim, the plaintiffs may also assert a Title IX claim under § 1983. Neither the Eleventh Circuit nor the Supreme Court of the United States has been called upon to decide this issue. While § 1983 allows a cause of action based upon the violation of a federal statute, a statute's enforcement mechanisms may be " 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Lakoski v. James*, 66 F.3d 751, 754 (5th Cir.1995) (citation omitted). Hence, "to determine whether Congress intended to foreclose the § 1983 remedy for rights created by a federal statute, courts look to the remedial measures provided by the statute itself." *Id.*

In *Lakoski*, the Fifth Circuit addressed Title IX only in the context of determining that it does not create an avenue separate from Title VII for asserting employment discrimination claims. There, a professor who was denied tenure brought a sex discrimination action against a state university medical branch under Title IX and also under § 1983 based upon Title IX. *Id.* at 752. In disallowing both claims, the Fifth Circuit rea-

---

13. Although the plaintiffs do not clearly allege in the complaint that their § 1983 claim is based upon both Title IX and the Fourteenth Amendment, they argue in brief, without citation to

authority, that this "statutory right, along with the constitutionally[-]based right, are both actionable" under § 1983. Pl.s' Suppl.Mem., filed Jan. 12, 1995, at 11 n. 3.

soned that Title VII provided the exclusive remedy for employment discrimination and that Title VII's comprehensive remedial scheme barred a lawsuit based upon Title IX directly and indirectly through § 1983. *Id.* at 756–58. The court reasoned that, in enacting Title IX, Congress did not intend for Title IX "to provide a bypass to Title VII's administrative procedures." *Id.* at 758.

The court finds that the Fifth Circuit's reasoning does not extend to the facts of this case, since the plaintiffs have no remedy under Title VII. Title VII protects *only employees*, who claim discrimination in the workplace. Because the plaintiffs are not *employees* of the school system, but rather are students, they are not privy to an employee-employer relationship and, thus, cannot avail themselves of Title VII's remedies. Second, unlike Title VII, which requires an employee to first pursue administrative remedies before seeking judicial relief, Title IX contains no similar provisions. Rather, the "[t]ermination of federal funding is the sole remedy expressly available for violations of Title IX." *Id.* at 754 (citations omitted).

The Sixth Circuit also has addressed Title IX preemption but confined its holding to a determination that the identical facts underlying a Title IX claim could also constitute violations of the United States Constitution for which § 1983 provided a remedy. *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d

716, 723 (6th Cir.1996). Nonetheless, *Lillard* provides insight about Title IX's remedial scheme. There, three students and their parents filed a § 1983 action against a teacher/coach, principal, board of education, and superintendent claiming that the teacher sexually harassed and physically abused students. In arguing Title IX preemption, the defendants relied upon *Middlesex County Sewerage Auth. v. National Sea Clammers Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).[14] *Id.* at 722. After distinguishing *National Sea Clammers*, the Sixth Circuit held that, based upon Title IX's absence of a comprehensive enforcement scheme, an alternative remedy to Title IX included a § 1983 claim based upon constitutional violations. *Id.* The court further noted that "even if the defendants' argument had been directed at an attempt by the plaintiffs to enforce their Title IX rights, rather than their constitutional rights, through section 1983, *National Sea Clammers* would have provided no support." *Id.* at 723. Hence, it appears that *Lillard* may have allowed a Title IX claim under § 1983.

Nonetheless, the court need not decide whether a plaintiff may bring a concurrent Title IX claim under § 1983. In this case, the plaintiffs' claim brought directly pursuant to Title IX provides full redress for the plaintiffs' grievances. That is, a claim against the

---

**14.** The facts and holding of *National Sea Clammers* are succinctly set forth in *Lillard*:

> The plaintiffs in *National Sea Clammers* brought claims for injunctive and monetary relief, alleging that the EPA and the Army Corps of Engineers permitted New Jersey and New York to discharge pollutants in violation of two federal environmental statutes, and that New Jersey and New York violated the terms of permits issued under those statutes. The Court first concluded that the statutes contained no implied private rights of action, given the "unusually elaborate enforcement provisions" expressly established, including both citizen suits and enforcement by government agencies. *Id.* at 13, 101 S.Ct. at 2623. The Court then went on to consider whether, in the alternative, the plaintiffs could sue under section 1983, noting that in a prior case, *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Court had construed section 1983 as authorizing suits to redress violations by state officials of rights created by federal statutes. *National Sea Clammers*, 453

U.S. at 19, 101 S.Ct. at 2625–26. The Court concluded that "Congress foreclosed a § 1983 remedy" under the statutes in question, *id.*, and that no such suit was available:

> > "When the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy under § 1983.... As discussed above, [the statutes at issue] do not provide quite comprehensive enforcement mechanisms. It is hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including the two citizen-suit provisions. We therefore conclude that the existence of these express remedies demonstrates not only that Congress intended to foreclose implied private action but also that it intended to supplant any remedy that otherwise would be available under § 1983."

76 F.3d at 722 (citing *National Sea Clammers*, 453 U.S. at 20–21, 101 S.Ct. at 2626–27 but omitting footnote and citations).

Board of Education under § 1983 based upon Title IX is duplicitous and unnecessary, because there are no additional remedies, legal or equitable, available to the plaintiffs under § 1983. Hence, the court will *sua sponte* dismiss the plaintiffs' Title IX claim brought pursuant to § 1983.

■ Assuming that Title IX does not preempt a concurrent Title IX claim under § 1983, the second issue is whether the individual defendants can be sued for a Title IX violation *under § 1983.* More specifically, based upon the court's finding, *supra,* that Title IX does not create liability on the part of individual defendants, can the plaintiffs now bypass this prohibition simply by bringing a separate claim under § 1983 for a violation of Title IX? Even though the court has been unable to locate any authority on this question, its answer is "No." *See Doe v. Petaluma City School Dist.,* 54 F.3d 1447 (9th Cir.1995) (On school counselor's interlocutory appeal from the denial of qualified immunity based upon a Title IX action brought under § 1983, the Ninth Circuit reversed the district court's order denying this defense but held that it did not have jurisdiction to decide whether a school supervisory official can be sued, in the first place, for a Title IX violation using § 1983.). That is, the court finds that a § 1983 action against the individual defendants to enforce rights under Title IX would effectively allow the plaintiffs to gain remedies unavailable under Title IX and to circumvent the congressional intent to foreclose such Title IX actions.

### B. The Substantive Due Process Claim

■ The plaintiffs further assert that the defendants' failure to prevent and stop the alleged sexual abuse by the public school teacher violated their substantive due process rights of "personal safety, security and privacy guaranteed by the [F]ourteenth [A]mendment," as enforced by 42 U.S.C. § 1983. Pls.' Compl. at ¶ 18. The plaintiffs assert two theories of liability to prove their Substantive Due Process claim brought under § 1983.[15] First, the plaintiffs contend that the defendants' absence of an adequate sexual abuse policy and training in the prevention of sexual abuse proximately caused the plaintiffs' injuries. Second, the plaintiffs allege that the defendants' failure to supervise its subordinates (namely, its teachers)— in part by ignoring and failing to investigate complaints regarding Mr. Smith's alleged sexually inappropriate conduct toward students—also violated the plaintiffs' constitutional rights to bodily integrity. The defendants may be held liable under a supervisory theory if, in sum, their actions or inactions amount to a "deliberate indifference" of the plaintiffs' constitutional rights. *See Doe v. Hillsboro Independent School Dist.,* 81 F.3d 1395, 1403–04 (5th Cir.1996) (holding that on motion to dismiss, the student had properly pleaded a § 1983 substantive due process claim against supervisory school officials for inadequate hiring policies and failure to supervise, which allegedly resulted in the student being assaulted and raped by a custodian).

The plaintiffs are suing the members of the Board of Education, the Principal and Superintendent, individually and their official capacities. The defendants have moved for summary judgment on the § 1983 claim asserted against them in their individual capacities only. That is, they contend that, in their individual capacities, they are immune from damages under the well-established doctrine of qualified immunity.[16] The plain-

---

**15.** The court notes that Title IX does not preempt § 1983 actions based upon pre-existing constitutional rights. *See Lipsett,* 864 F.2d at 901; *Lillard,* 76 F.3d at 723 (noting that Title IX does not supplant § 1983 actions based upon "wholly independent, and totally distinct" constitutional claims). Title VII's body of case law supports the court's conclusion, particularly since Title VII and Title IX's prohibitions against sex discrimination are the same and Title VII's legal principles also govern sex discrimination claims brought under Title IX. Although holding that § 1983 forecloses actions based upon Title VII,

the Fifth Circuit has noted that "... Congress did not intend Title VII to preempt § 1983 claims based upon rights already held by individuals, such as constitutional rights." *Lakoski,* 66 F.3d at 755.

**16.** The plaintiffs' § 1983 cause of action against the individual defendants in their official capacities for injunctive relief remains viable and is not barred by the Eleventh Amendment. *See Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974); *see Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed.

tiffs can avoid summary judgment by showing that the defendants are not entitled to qualified immunity as a matter of law or that genuine issues of material fact exist so that the determination of whether the defendants are entitled to qualified immunity are only properly determined after findings of fact have been made by the jury. *Rich v. Dollar,* 841 F.2d 1558, 1562 (11th Cir.1988).

### 1. Qualified Immunity Principles

The Supreme Court of the United States has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Rich,* 841 F.2d at 1563. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

The test for whether a governmental defendant is entitled to qualified immunity from liability in his or her individual capacity involves a two-step analysis. A government official first must demonstrate that " 'he [or she] was acting within the scope of his [or her] discretionary authority when the allegedly wrongful acts occurred.' " *Rich,* 841 F.2d at 1563–64 (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)). If the defendant satisfies this burden, the plaintiff must show either that the official's actions " 'violated clearly established constitutional law' " or a federal statute. *Id.*

The court will address the first prong of the *Zeigler* inquiry. The evidence is undisputed that the defendants were acting within their discretionary authority concerning the allegations of alleged sexual abuse by the school teacher. The record reveals that defendants' actions (or, rather, inactions) were undertaken pursuant to the performance of their duties and were within the scope of their discretionary authority. *Hutton v. Strickland,* 919 F.2d 1531, 1536 (11th Cir.1990).

Under the second prong, the court must determine whether the applicable law was clearly established at the time of the challenged action. This is determined by reference to decisions of the Supreme Court of the United States, the Court of Appeals for the Eleventh Circuit and, in this case, the Supreme Court of Alabama. *D'Aguanno v. Gallagher,* 50 F.3d 877, 881 n. 6 (11th Cir. 1995); *Courson v. McMillian,* 939 F.2d 1479, 1498 and n. 32 (11th Cir.1991). The relevant inquiry is "fact specific," *Rodgers v. Horsley,* 39 F.3d 308, 311 (11th Cir.1994) (De Ment, J.),[17] and the plaintiff must point to a controlling case, decided before the events at issue, that establishes a constitutional violation on "materially similar" facts. *Lassiter v. Alabama A & M University, Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994). As emphasized in *Lassiter,* "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable gov-

714 (1908) (When federal rights are asserted against state actors sued in their official capacities, the law prohibits claims for retrospective monetary relief paid from the state treasury but not prospective equitable relief.).

17. In *Rodgers,* the Eleventh Circuit reversed this court's order denying the defendants qualified immunity on a motion for summary judgment. The Eleventh Circuit's inquiry in that case demonstrates the factual depth required for determining whether the law was clearly established:
 The question in this case is not whether, in general, involuntarily committed patients have a legally cognizable interest under the Fourteenth Amendment to safe conditions. They do. Instead, the question in this case, as in all qualified immunity cases, is fact specific: in

May 1991, was it clearly established in this circuit that it was unconstitutional for a mental institution to fail to supervise a patient for fifteen minutes in the smoking room when she was on close watch status for a health problem, when the institution had a history of some "sexual contact" involving patients other than plaintiff but no history of rape for the past twelve years, where a previous patient who was to be similarly monitored disappeared, apparently escaped through a bathroom window, and fell to her death on a ledge below, and where the plaintiff had never before complained of unwanted sexual contact from either the patient accused, any other patient, or any member of the staff? The answer is "NO."
 *Id.* at 311.

ernment agent that what the defendant is doing violated federal law in the circumstances." *Id.* (italics supplied); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (holding that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right").

### 2. Deprivation of a Constitutional or Federal Right

The Supreme Court of the United States has stated that "[a] necessary concomitant to the determination of whether the constitutional right or federal statutory right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Thus, in following the instructions in *Siegert*, the Eleventh Circuit generally first determines whether a plaintiff has asserted a constitutional *violation* before delving into the qualified immunity analysis. *See Tinney v. Shores*, 77 F.3d 378, 381 (11th Cir.1996) (citing *Wooten v. Campbell*, 49 F.3d 696, 699 (11th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 379, 133 L.Ed.2d 302 (1995)); *Jordan v. Doe*, 38 F.3d 1559, 1564 (11th Cir.1994).

However, in a recent case, the Eleventh Circuit diverged from this order of analysis stating that "we now think it enough to decide that there was no *clearly established* constitutional right allegedly violated by the defendants." *Spivey v. Elliott*, 41 F.3d 1497, 1498 (11th Cir.1995) (italics added). There, the panel decided *sua sponte* to reexamine if *Siegert, supra*, required it to first determine "whether the violation of a constitutional right had been alleged" or whether it was sufficient to only decide "that there was no 'clearly established' constitutional right alleged." *Id.* at 1498. In its prior opinion (*Spivey v. Elliott*, 29 F.3d 1522 (11th Cir. 1994)), the majority members of the divided panel held that a student had a "special relationship" with officials of a residential state school for the deaf, thus, imposing a constitutional duty on the school to protect students from peer sexual assaults. *Id.* at 1498. However, the court then held that because this duty was not clearly established at that time, the school officials were entitled to qualified immunity. *Id.* The third member of the panel dissented, in part, stating that he would decide the case on the plaintiff's failure to allege a violation of the Constitution, thus, rendering it unnecessary to ever reach the "clearly established" prong. *Id.*

Upon reconsideration, the panel stated that, in that case, further analysis regarding the substantive right alleged would be "expensive" and burdensome to the parties: "Once there has been a determination that there is no 'clearly established' right, the parties can accomplish little in pursuing the question of whether there is a right at all. The same parties will win and the same parties will lose regardless of the court's decision on that point." *Id.* at 1498–99. The panel further reasoned that

in the interest of efficiency and collegiality on this Court, where there are differing views as to the substantive right, this panel has chosen to withdraw all of its prior opinion which relates to whether the complaint alleges a constitutional right so that the opinion will serve as no precedent on that issue.

*Id.* at 1499. In so deciding, however, the panel was careful not to establish precedent: In addition to stating that "[t]hose who differ with the decision … could write it off as dictum," the panel emphasized that its decision in no way precludes a court, if deemed appropriate, from first determining whether a plaintiff has asserted the violation of a constitutional right. *Id.*

Here, the court likewise finds that determining whether the plaintiffs have first asserted a constitutional violation would be a futile exercise. The defendants, in their official capacities, are without a doubt entitled to qualified immunity, particularly based upon the absence of any factually-similar controlling case law, discussed *infra.*

In *Covington 1*, the court did find, however, that based upon *Doe v. Taylor Independent School District*, 15 F.3d 443, 452 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct.

70, 130 L.Ed.2d 25 (1994), the plaintiffs had stated a failure-to-supervise claim under the Substantive Due Process Clause of the Fourteenth Amendment.[18] Without finding, the court notes that while the complaint's allegations withstood a motion to dismiss, the court has serious doubts about whether, at the summary judgment stage, the plaintiffs have asserted a failure-to-supervise constitutional claim against the individual members of the Board of Education and the Superintendent. That is because the plaintiffs have not submitted evidence that these defendants had *any* notice. While on a motion to dismiss, the plaintiffs were not required to produce the specific names of those supervisory officials who had received notice about the alleged sexual abuse, they have had ample time for discovery and are required to do so at this stage of the litigation. *See Hillsboro Indep. School Dist.,* 81 F.3d at 1403–04.

▉ To assert a constitutional violation for the failure to develop policies or afford training for the detection and investigation of alleged incidents of child abuse, the plaintiffs must show that: (1) the policy or failure to have one was inadequate; (2) school supervisory officials were deliberately indifferent in adopting or failing to adopt a policy; and (3) the inadequate policy or failure to have a policy directly caused the plaintiffs' injury. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The court declines to decide whether the plaintiffs have asserted this type of constitutional violation, because all defendants are entitled to qualified immunity.

### 3. Qualified Immunity Analysis

The plaintiffs must overcome the onerous burden of defeating the qualified immunity. defense in order to recover monetary damages from the pocket of a government official. In fact, based upon the repeated case law in this circuit, a more appropriate name for this defense would be "unqualified immunity." Hence, the court now must analyze the plaintiff's substantive due process claims in the context of qualified immunity.

▉ First, it is important to identify what issues are not before the court. The question is not whether the plaintiffs have a Fourteenth Amendment substantive due process right not to be harassed or sexually abused by a teacher. They do. *See Ingraham v. Wright,* 430 U.S. 651, 673, 97 S.Ct. 1401, 1413–14, 51 L.Ed.2d 711 (1977). The issue also is not whether, in general terms, school officials can violate a student's Fourteenth Amendment substantive due process rights by knowingly failing to take steps to eliminate a teacher's sexual harassment of school children or by having inadequate training policies and procedures. They can. *See Stoneking,* 882 F.2d at 727; *Vineyard v. County of Murray, Ga.,* 990 F.2d 1207 (11th Cir.1993). The qualified immunity inquiry does not stop at such an abstract level. Rather, to attach individual liability to the defendants, the plaintiffs must prove that the defendants "violated not only a constitutional right, but a 'clearly established' constitutional right." *Hamilton v. Cannon,* 80 F.3d 1525 (11th Cir.1996).

▉ As emphasized by Judge Edmondson in *Lassiter,* the inquiry is "fact specific," and the plaintiffs must point to a controlling case with "materially similar" facts, decided before 1992, in order to show that the law was clearly established. 28 F.3d at 1150. Hence, the first issue is whether, in 1992, it was clearly established in this circuit that a constitutional violation

---

18. Finding no controlling law in this circuit regarding the Fourteenth Amendment and a supervisor's duty to protect school children's liberty interests when allegations of sexual abuse are asserted, the court adopted the Fifth Circuit's test. This three-part test requires a plaintiff to show that:

(1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student;

(2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and

(3) such failure caused a constitutional injury to the student.

*Id.* at 454; *see also Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 725 (3d Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (same).

occurs when a school principal receives complaints on several occasions about a teacher—that the teacher appeared to exhibit homosexual mannerisms; that he sometimes insisted that students sit on his lap; that one time after a parent-teacher conference, a student was missing for a short period of time and was later discovered coming out of the teacher's classroom, holding the teacher's hand; that the teacher had sent a student a Christmas card, Birthday card, candy and a dollar bill, as well as a note wherein the teacher tells the student that he sat in the student's classroom desk during a teacher's meeting—and thereafter the school principal reprimands the teacher when he sees the teacher at school with a young boy sitting in his lap, but fails to take any other action, where there is no evidence in the record that the teacher had a past history of any inappropriate contact with children or that, prior to 1992, anyone had ever complained to school officials about any inappropriate conduct on the part of the teacher. The answer is "No."

Here, the plaintiffs point only to general principles of the Fourteenth Amendment's Substantive Due Process Clause. For instance, the plaintiffs rely on the Fifth Circuit's conclusion in *Taylor Independent School District* that constitutional law was clearly established regarding the student's substantive due process right to be free from sexual molestation and a school supervisory official's duty with respect to that violation. 15 F.3d at 455. Simply stated, the Eleventh Circuit's interpretation of the "clearly established" language in *Harlow, supra,* and its progeny requires a much higher degree of factual correspondence between the officials' actions and pre-existing case law than does that of the Fifth Circuit. In other words, the types of cases relied upon by the Fifth Circuit in finding a supervisory official's duty

"clearly established" would not create a clear, bright line in the Eleventh Circuit.

Additionally, the plaintiffs recitation of factual similarities in *Stoneking, supra,* a decision emanating from the Third Circuit, is equally unavailing.[19] While courts in other circuits have held that supervisory school officials have a constitutional duty not to be deliberately indifferent to a subordinate's violation of a student's right to bodily integrity, that law is not clearly established in the Eleventh Circuit. For another reason, neither *Taylor Independent School District* nor *Stoneking* carry weight because both cases were decided well after the plaintiffs complained of the alleged sexual abuse by Mr. Smith.

■■■ The plaintiffs further argue that they have met their burden on summary judgment because disputed issues of fact exist as to whether the defendants' actions constitute "deliberate indifference" and whether the notice provided the defendants was sufficient. However, even disputes over genuine issues of material fact will not "preclude summary judgment premised on a defendant's qualified immunity if the *legal norms* allegedly violated were not clearly established at the time of the challenged actions." *Rich,* 841 F.2d at 1564. For example, in *Barts v. Joyner,* 865 F.2d 1187 (11th Cir.), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989), the plaintiff brought an action under § 1983 against deputies alleging that their detention and transportation of her to the sheriff's station was an unlawful seizure within the meaning of the Fourth Amendment. After finding that the law was not clearly established, the court found it unnecessary to proceed to the question of whether an objectively reasonable officer under similar circumstances could have believed the defendant's conduct to be lawful. *Id.* at 1188–95. Hence, because the law was

19. In *Stoneking,* the plaintiff presented evidence of numerous complaints from other students and teachers involving incidents of sexual abuse by a band director and social studies teacher. In response to each report, the defendant discouraged the complainant from pursuing further action. In one instance, the defendant blamed the student for the sexual conduct and forced her to apologize publicly for accusing the teacher. 882 F.2d at 722, 727–28. The defendants also maintained secret records of these episodes and took no disciplinary action against the teachers. *Id.* at 728. They continued to employ the band director and social studies teacher in the same capacity and gave each of them excellent evaluations. *Id.* In light of such evidence, the court concluded that the plaintiffs were entitled to maintain a 1983 cause of action against the defendants, thus rejecting the defendants' qualified immunity defense.

not clearly established at the time of the alleged constitutional violations, qualified immunity should be granted regardless of any factual disputes relating to the underlying cause of action. In other words, only if the law is clearly established, may the court then deny summary judgment based upon disputed material facts concerning the circumstances under which the public official acted.

 The plaintiffs also assert that their rights were conclusively resolved by the Supreme Court in *Franklin* when it acknowledged, without holding, that sexual abuse of a student by a teacher constitutes sex discrimination under Title IX. 503 U.S. at 75, 112 S.Ct. at 1037–38. The law, however, cannot be established by dicta. As stated by the Eleventh Circuit,

> [d]icta is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law. *See, e.g., Jones v. White*, 992 F.2d 1548, 1566 (11th Cir.) ("[F]or law-of-the-circuit purposes ... [the review of any precedent] ought to focus far more on the judicial decision than on the judicial opinion." (citation and quotation marks omitted) (alterations in original)), *cert. denied*, 510 U.S. 967, 114 S.Ct. 448, 126 L.Ed.2d 381 (1993).

*Hamilton*, 80 F.3d 1525, 1530–31. Additionally, a federal statute's requirements cannot create clearly-established law when the plaintiffs allege violations of the United States Constitution. As stated by the Supreme Court, "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). In other words, clearly established rights must arise from the same law upon which the claim for relief is based.

 The court further finds that the defendants are entitled to qualified immunity on the plaintiffs' claim based upon inadequate policies and training. That is, the court finds that, in 1992, it was not clearly established that government officials violate a school child's *substantive due process rights* by not having a sexual abuse prevention policy and by failing to train and/or supervise its personnel in sexual abuse prevention/intervention. This portion of the plaintiffs' § 1983 claim is premised on the defendants' alleged failure to comply with Title IX's regulatory requirements to implement such a policy and practices. However, as already stated, *supra*, a violation of a federal statute cannot clearly establish the law, when the underlying cause of action, as here, is based upon a right secured by the United States Constitution.

In sum, the plaintiffs have not cited, nor has the court found, any cases with *closely analogous facts* decided by the Court of Appeals for the Eleventh Circuit, the Supreme Court of the United States, or the Supreme Court of Alabama. The plaintiffs simply have failed to grasp the Eleventh Circuit's *fact-specific* requirement of the qualified immunity defense. As stated in *Lassiter*, the most "common error" in qualified immunity cases is when courts "permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" 28 F.3d at 1150. Based upon this reasoning, the Eleventh Circuit reversed this court's denial of qualified immunity in *Rodgers, supra*. The Eleventh Circuit recognized that involuntarily committed mental patients have a "legally cognizable interest under the Fourteenth Amendment to safe conditions," but proceeded to deny a remedy for the enforcement of the right by holding that the assertion of a general constitutional interest is not sufficient for qualified immunity purposes. *Rodgers*, 39 F.3d at 311. Accordingly, the court finds that the defendants are entitled to qualified immunity in their individual capacities for monetary damages under § 1983.

### III. SUPPLEMENTAL STATE LAW CLAIMS

 The defendants have raised the defenses of sovereign and discretionary immunity as to the tort claims asserted against them. In *Covington 1*, the court found that the Board of Education, as an arm of the state, and its individual members in their official capacities were not subject to tort liability under the doctrine of sovereign, i.e., absolute immunity. *See Covington 1*, 884

F.Supp. at 466; *see also Palmer v. Perry County Bd. of Educ.,* 496 So.2d 2, 5 (Ala. 1986); *C.B. v. Bobo,* 659 So.2d 98, 101 (Ala. 1995); Ala. Const., Art. I, § 14. The court similarly found that the Principal and Superintendent were entitled to sovereign immunity in their official capacities for the state tort claims alleged. *Covington 1,* 884 F.Supp. at 466; *see also Hickman v. Dothan City Bd. of Educ.,* 421 So.2d 1257, 1259 (Ala.1982).

These defendants in their individual capacities are not, however, entitled to sovereign immunity. *See Palmer,* 496 So.2d at 5 (holding that individual board members may be held personally liable for their negligent conduct). The defendants in their individual capacities may, however, "be entitled to substantive immunity [i.e., discretionary immunity] from alleged negligent conduct if their action falls within the exercise of a discretionary function." *Id.* (brackets supplied), citing *Hickman v. Dothan City Board of Educ.,* 421 So.2d 1257 (Ala.1982).

The parties supplemental submissions, as directed herein, may aid the court in determining whether the defendants are entitled to discretionary immunity, which involves a fact-specific analysis. Hence, the court will reserve ruling on this issue.

## ORDER

For the reasons discussed herein, it is CONSIDERED and ORDERED as follows:

(1) that the defendants' motion for summary judgment on the plaintiffs' Title IX cause of action, if any, against the individual members of the Board of Education, the Principal and Superintendent be and the same is hereby GRANTED;

(2) that the defendants' motion for summary judgment on the basis that, under Title IX, the plaintiffs are precluded from seeking judicial relief for failure to exhaust administrative remedies be and the same is hereby DENIED;

(3) that the court RESERVES ruling on the defendants' motion for summary judgment on the plaintiffs' substantive Title IX claim for a "sexually hostile education environment;" that the plaintiffs are DIRECTED to submit to the court on or before May 20, 1996, in the form of admissible evidence, the information and law requested herein on pages 569–570; and that the defendants may file a response thereto on or before May 27, 1996;

(4) that the court RESERVES ruling on the defendants' motion for summary judgment on the plaintiffs' substantive Title IX claim that the Board of Education has failed to comply with the requirements listed in 34 C.F.R. §§ 106.8 & 106.9; that the defendants are DIRECTED to submit to the court on or before May 20, 1996, in the form of admissible evidence, the information requested herein on pages 571–572; and that the plaintiffs may file a response thereto on or before May 27, 1996;

(5) that the plaintiffs' Title IX claim brought pursuant to § 1983 be and the same is hereby DISMISSED *sua sponte;*

(6) that the individual members of the Board of Education, the Superintendent and the Principal be and the same are GRANTED qualified immunity in their individual capacities for damage claims under § 1983;

(7) that the court will RESERVE ruling on the defendants' discretionary immunity defense as to the state tort claims; and

(8) that the plaintiffs are DIRECTED to notify the court in writing of the status of Mr. Mike Smith's criminal proceedings in Alabama and Florida and are further DIRECTED to file with the court certified copies of either guilty verdicts and judgments entered thereon, not-guilty verdicts and judgments entered thereon, guilty pleas and judgments entered thereon, or dismissal of charges, whichever may be applicable.